UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINA
RICHMOND DIVISION

| | |
|---|---|
| DEMOCRATIC PARTY OF VIRGINIA,<br><br>      *Plaintiff*,<br><br>  v.<br><br>FRANK VEAL, in his official capacity as the South Atlantic Division Manager for the United States Postal Service, GERALD ROANE, in his official capacity as Virginia District Manager of the United States Postal Service,<br><br>      *Defendants*. | Civil Case No. 3:21-cv-671 |

**PLAINTIFF'S EMERGENCY MOTION
FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION
AND MEMORANDUM IN SUPPORT THEREOF**

## TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................................... 1
STATEMENT OF FACTS ....................................................................................................... 3
    A.   USPS's 2020 Changes ................................................................................................. 3
    B.   Mail delivery in Virginia in October 2021 ................................................................. 4
    C.   DPVA's 2021 Coordinated Campaign ........................................................................ 6
ARGUMENT .............................................................................................................................. 7
    A.   DPVA is likely to succeed on the merits of its claim. ............................................... 7
    B.   Without immediate relief, DPVA will suffer irreparable harm. ............................... 14
    C.   The public interest and the balance of equities favor the requested relief. ............. 15
CONCLUSION ........................................................................................................................ 16

# INTRODUCTION

Election day is just eight days away, and significant delays in the processing of election-related mail by the United States Postal Service ("USPS") threaten to disenfranchise lawful Virginia voters by preventing them from receiving or timely returning their absentee ballots. Plaintiff Democratic Party of Virginia ("DPVA") brings this emergency motion pursuant to Federal Rule of Civil Procedure 65 for a temporary restraining order and preliminary injunction requiring Defendants, who are regional USPS officials, to cause USPS to (1) deliver all election-related mail within Virginia no later than three days after its entry into USPS's system, and (2) process all outstanding election-related mail in Albemarle County and the City of Portsmouth within 24 hours of the entry of the Court's order.[1] Such an order is urgently needed to protect Virginians' most fundamental right. And the number of Virginia voters who become susceptible to disenfranchisement as a result of Defendants' failure to timely process election mail grows with each passing day.

More than 406,000 Virginia voters have requested absentee ballots for the 2021 general election. Ex. F, Decl. of Andrew Whitley ¶ 12. To be counted, each of those ballots must be received by the voter, properly completed, and either submitted to USPS, returned directly to a registrar, or deposited in a designated dropbox no later than 7:00 p.m. on November 2 (the "postmark deadline"). Va. Code § 24.2-709. Yet, voters who have timely requested ballots are experiencing significant delays in USPS processing of those ballots. These delays threaten to impede, and in some cases, deny, the right to vote. If a voter is expecting a ballot that never arrives, they may realize too late that they will have to plan another way to vote; and for some voters,

---

[1] In its Complaint, DPVA also included specific allegations based on a backlog of ballots in James City County. Based on data acquired today, it appears James City has cleared its backlog of unscanned ballots. DPVA therefore is not currently seeking emergency relief with respect to James City County specifically.

including the severely immunocompromised, disabled, or those temporarily away from Virginia, they may be unable to vote at all. Others who receive the ballot in time to vote and return it by Virginia's postmark deadline remain vulnerable to disenfranchisement as a direct result of USPS's significant delays. Even timely postmarked ballots will be rejected if not received by the proper registrar before noon on November 5. *Id.* § 24.2-709(B).

The significant mail delays also threaten to deprive Virginia voters of their ability to "cure" technical errors with their ballot absentee envelopes in time to save them from rejection: although Virginia law guarantees them this right, *id.* § 24.2-709.1(C), a voter must be made aware of a defect before they can cure it. Virginia allows voters to cure ballots up through noon on November 5, but only requires registrars to notify those voters whose ballots are received by this Friday, October 29, that their ballot has been flagged for rejection for a curable issue. *Id.* And, of course, the later a voter learns of an issue, the narrower the window they have to remedy the problem. The impact that USPS delays are having on curable ballots is significant in its own right: more than two percent of absentee ballots returned by Virginia voters so far in this election have been flagged by general registrars for technical, but wholly curable defects. Whitley Decl. ¶¶ 12-13. For such ballots, prompt processing by USPS is critical.

The problems are severe. As of the date of this filing, October 25, about 5.48 percent of absentee ballots sent to Virginia voters by general registrars—a total of more than 17,000 ballots— had not received even an initial scan by USPS, indicating that they had not even begun their journey to the requesting voters. Whitley Decl. ¶ 8. In Albemarle County and the City of Portsmouth, the portion of unscanned ballots was even higher, with 34 percent and 24 percent of all ballots, respectively, sitting unscanned in postal facilities. *Id.* ¶ 8. Absent immediate action by USPS to remedy this problem and expedite the processing of election-related mail, many voters

will receive their ballots too late to timely complete and return them, and others will timely complete their ballots, only to have them received too late to be counted. Still others will miss the opportunity to cure a technical defect with their absentee ballot envelope, in order to save their ballot from wholesale rejection. To preserve the integrity of the present election, USPS must be ordered to greatly expedite its processing and delivery of election related mail—particularly in Albemarle County and the City of Portsmouth—so that voters across the Commonwealth (including among DPVA's membership) are not unconstitutionally denied their fundamental right to vote.

## STATEMENT OF FACTS

### A. USPS's 2020 Changes

Much has changed at USPS in the last 18 months. In May 2020, former President Trump appointed Louis DeJoy as United States Postmaster General. Shortly thereafter, DeJoy and other top brass announced sweeping changes to how USPS would operate. Overtime was eliminated and trucks were mandated to leave distribution centers on a rigid schedule, even if this meant they were leaving only partially full.[2] Internal USPS memos from July 2020 acknowledged that these changes may result in postal workers "see[ing] mail left behind or mail on the workroom floor."[3] The impact of these policy choices was felt almost immediately. On-time delivery rates declined dramatically throughout the postal system. There were widespread reports of mail piling up in

---

[2] Ex. A, Jacob Bogage, *Postal Service memos detail 'difficult' changes, including slower mail delivery*, Washington Post, Jul. 14, 2020.

[3] *Id.*

regional distribution centers and at post offices around the country, and of customers experiencing substantial delays and disruptions in mail service.[4]

The new policies had a significant impact on elections mail, with the delays making it very difficult for voters and election officials across the nation to meet various deadlines for voting by mail. On July 30, 2020, USPS's General Counsel sent letters to 46 states, including Virginia, warning them of a mismatch between the states' deadlines related to mail-in voting and USPS's likely delivery times. The Virginia letter advised Department of Election Commissioner Christopher Piper that his "elections officials [should] use First-Class Mail to transmit blank ballots and allow *1 week* for delivery to voters."[5] (The previous standard for First-Class mail was delivery within three days). It expressly warned that certain Virginia "state-law requirements and deadlines appear to be incompatible with the Postal Service's delivery standards and the recommended timeframe noted above" and that, under current circumstances, some ballots may "not be returned in time to be counted."[6] Less than a month later, Virginia, along with 13 other states, filed suit in federal court alleging that the changes announced by the postal service—particularly with respect to election mail—"are both procedurally and substantively unlawful."[7]

### B. Mail delivery in Virginia in October 2021

The 2020 policies were not the last of the dramatic changes USPS's new management would implement. In April 2021, Postmaster General DeJoy announced an expansive new 10-year

---

[4] Ex. B, Luke Broadwater et al., *Postal Crisis Ripples Across Nation as Election Looms*, N.Y. Times, Aug. 15, 2020.

[5] Ex. C, Letter from Thomas Marshall to Hon. Christopher Piper (Jul. 30, 2020) (emphasis added).

[6] *Id.*

[7] *Washington et al v. Trump et al*, 1:20-CV-03127-SAB, ECF No. 1, ¶ 5 (E.D. Wa. 2020).

4

plan for USPS under which the overall delivery standard for First-Class mail would drop from three to five days, particularly for mail traveling longer distances.[8] Experts predicted that the slowdowns would impact 40% of all First-Class mail and result in delivery times equivalent to the 1970s in some areas.[9] The slowdowns were scheduled to begin on October 1, 2021, just as the demand of on-time delivery of election mail hit its peak here in the Commonwealth for the 2021 general election.

The October slowdown has already strikingly impacted the on-time delivery of election mail in Virginia, particularly in certain counties with substantial numbers of Democratic voters. The problem is most acute in Albemarle County and the City of Portsmouth, where data from the Virginia State Board of Elections indicates that thousands of ballots, after having been delivered to USPS from county elections officials, have been sitting unscanned and undelivered in the counties' USPS facilities. Whitley Decl. ¶ 8. As of October 25, these numbers were:

| County/City | Number of Unscanned Ballots | Percentage of Unscanned Out of All Ballots Requested |
|---|---|---|
| Albemarle County | 2,562 | 33.86% |
| City of Portsmouth | 1,056 | 24.2% |

While these numbers are outliers, the issue is not limited to these jurisdictions, and Albemarle County and the City of Portsmouth together account for only 21.19 percent of the

---

[8] Ex. D, Kristen Holmes et al., *Postmaster General announces 10-year plan including longer mail delivery times and cuts to post office hours*, CNN, Mar. 23, 2021.

[9] Ex. E, Aimee Picchi, *Mail delivery slowdown: USPS to slow delivery starting October 1*, CNN, Oct. 1, 2021.

17,075 unscanned ballots across the state. Whitley Decl. ¶ 8.[10] In total, 5.48 percent of all requested absentee ballots across Virginia remain unscanned after entering USPS's possession, seemingly having not even begun their journey to the requesting voter.

### C. DPVA's 2021 Coordinated Campaign

DPVA's mission is to elect Democratic candidates in local, county, state, and federal elections and to help its members and constituents successfully vote. Whitley Decl. ¶¶ 2-3. In support of that mission, DPVA seeks to mobilize voters across the state to become engaged and vote in elections by mounting a comprehensive coordinated campaign supporting all Democratic candidates. The mobilization work of DPVA is even more crucial in off-year elections, like this year, where there are no federal races on the ballot. Increasingly, voters are casting absentee ballots through the mail—a trend that accelerated in 2020 during the pandemic and appears thus far to be continuing in 2021. Based on the number of ballots requested and returned thus far, DPVA projects that more than 300,000 Virginians will cast their ballot through the mail this election cycle, meaning that the on-time delivery of absentee ballots is even more critical to the success of DPVA's mission. Whitley Decl. ¶¶ 4-7.

During the 2020 election, more than 54% of Virginias, or nearly 2.5 million people, supported President Biden, and he carried Albemarle County and the City of Portsmouth with 66% and 69% of the vote respectively, solidifying their place as Democratic strongholds in the state. DPVA has been dedicating significant resources to turning out supporters in these areas—an effort made all the more difficult by slower mail delivery. Whitley Decl. ¶¶ 13-15.

---

[10] All numbers and rates in this motion exclude Fairfax County, which is the sole county in the Commonwealth not to report its USPS scan data in the figures provided to the Virginia Department of Elections.

# ARGUMENT

With Election Day just eight days away, USPS's delays in processing and delivering absentee ballots threatens to disenfranchise greater numbers of Virginia voters with each passing day. And once the election is over, it is over. There will be no redress for the potentially thousands of voters whose right to vote was effectively denied by USPS's unjustifiable delays at that point (including countless of the Commonwealth's Democratic voters). As a result, DPVA cannot obtain effective relief through the normal course of litigation. Emergency relief in the form of a temporary restraining order or a preliminary injunction is needed immediately to protect the fundamental right to vote.

"The standard for granting either a TRO or a preliminary injunction is the same." *Variable Annuity Life Ins. Co. v. Coreth*, No. 3:21cv223, 2021 WL 1566447, at *7 (E.D. Va. Apr. 21, 2021). For either form of relief, a movant must establish that: (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. *Id*. (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Here, all four factors favor the immediate issuance of the requested preliminary relief.

### A. DPVA is likely to succeed on the merits of its claim.

USPS's failure to promptly process and deliver election-related mail unconstitutionally burdens the fundamental right to vote of voters across Virginia, and the related First and Fourteenth Amendment rights of DPVA as a political party. "[A]ll qualified voters have a constitutionally protected right to vote . . . and to have their votes counted." *Reynolds v. Sims*, 377 U.S. 533, 554 (1964). When that right is wrongfully abridged, the rights of political groups like DPVA are also implicated, for "the right of individuals to associate for the advancement of political beliefs[] and the right of qualified voters . . . to cast their votes effectively" are "overlapping[] kinds of rights."

7

*Williams v. Rhodes*, 393 U.S. 23, 30 (1968). For that reason, "political parties have standing to assert, at least, the rights of [their] members who will vote in an upcoming election." *Fla. Democratic Party v. Scott*, 215 F. Supp. 3d 1250, 1254 (N.D. Fla. 2016). And they may do so even without identifying "*specific* aspiring eligible voters . . . who will be barred from voting; it is sufficient that some inevitably will." *Id.*

Government action unconstitutionally burdens voting rights when "the character and magnitude of the asserted injury to" the right to vote outweighs "the precise interests put forward by the [government] as justifications for the burden imposed" by the challenged law or practice. *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983); *see also Burdick v. Takushi*, 504 U.S. 428, 434 (1992). Where a "voter's rights are 'subjected to severe restrictions'" by government actions, those actions are unconstitutional unless they are "narrowly drawn to advance a [government] interest of compelling importance.'" *Libertarian Party v. D.C. Bd. of Elections & Ethics*, 682 F.3d 72, 74 (D.C. Cir. 2012) (quoting *Burdick*, 504 U.S. at 434). But even lesser burdens on voting rights "must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J., controlling op.) (quoting *Norman v. Reed*, 502 U.S. 279, 288–89 (1992)). The *Anderson-Burdick* framework establishes a "sliding scale" test, "where the more severe the burden, the more compelling the [government]'s interest must be." *Soltysik v. Padilla*, 910 F.3d 438, 444 (9th Cir. 2018); *see also Fusaro v. Cogan*, 930 F.3d 241, 257–58 (4th Cir. 2019). This framework is fully applicable to claims that USPS policies unconstitutionally burden the right to vote. *See Vote Forward v. DeJoy*, 490 F. Supp. 3d 110, 125 (D.D.C. 2020).

DPVA is highly likely to succeed in proving that USPS's delays in delivering election-related mail impose a severe burden on Virginia voters, by making it difficult or impossible for

many voters to complete and return their ballots in time for them to be counted. *See Doe v. Walker*, 746 F. Supp. 2d 667, 679–80 (D. Md. 2010) ("By imposing a deadline which does not allow sufficient time for absent uniformed services and overseas voters to receive, fill out, and return their absentee ballots, the state imposes a severe burden on absent uniformed services and overseas voters' fundamental right to vote."). Indeed, the mail slowdown may have already effectively disenfranchised some of these voters. USPS's delays burden the right to vote in several different ways.

*First*, the delays may already have prevented some Virginia voters from successfully requesting absentee ballots in the first place. Under Virginia law, an absentee ballot application "made by mail . . . . shall be made to the appropriate registrar no later than 5:00 p.m. on the eleventh day prior to the election in which the applicant offers to vote." Va. Code § 24.2-701(B). Although there is an exception for emergencies, the circumstances that qualify an individual to receive an emergency absentee ballot are tightly limited. *See* Va. Code § 24.2-705. For the present election, that deadline was last Friday, October 22, 2021. Because of the USPS slowdown, some voters' mailed applications likely missed the deadline, due to no fault of the voter. These voters may now be expecting an absentee ballot that will never arrive, and even those among them who can vote through other methods may not realize the need in time to do so. For those who *cannot* vote in any other way, not receiving the absentee ballot they timely requested will result in their being unable to vote at all. *See Price v. N.Y. State Bd. of Elections*, 540 F.3d 101, 109 (2d Cir. 2008) (stating "[i]t cannot be disputed that" a law prohibiting absentee voting during certain local elections "would impose a substantial burden on voters physically unable to attend a polling station because they are hospitalized, homebound, or incarcerated").

*Second*, the USPS delays mean that some voters who successfully requested absentee ballots may not receive their ballots in time to vote and timely return them. Once a voter receives an absentee ballot through the mail, the voter must fill it out and deposit it in the mail or a designated dropbox by the close of polls on election day. *See* Va. Code § 24.2-709. In the present election, the deadline is 7:00 p.m. on November 2, 2021. If USPS is not ordered to immediately expedite delivery of election-related mail, some Virginia voters may not receive their absentee ballots before that deadline and may therefore be unable to cast an absentee ballot at all.

Even voters who do eventually receive their ballots will have their voting rights burdened as a result of USPS's delays, which will leave them with far less time to complete and timely return their ballots. "Many individuals . . . , rely on the efficient delivery of their mail-in ballots so that they make take the time available to consider the issues and candidates in an election." *Vote Forward*, 490 F. Supp. 3d at 126. The slowdown denies voters this capability, making it significantly harder for them to make "informed choices among candidates for office." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346-47 (1995). Once voted, ballots must reach the voters' general registrar within three days of election day—this year, by noon on November 5. Va. Code § 24.2-709(B). If USPS's protracted delays continue, there is a significant risk that many ballots that are placed in the mail before the close of polls will not reach the registrars in time to be counted.

*Third*, the USPS delays mean that even some voters who receive their absentee ballots in time to vote and successfully return them by the deadlines set forth in Virginia law will *still* be disenfranchised, either (1) because they will not receive notice that their ballot has been flagged for rejection due to a curable technical defect, or (2) because they will run out of time to cure that defect. Virginia law provides that an absentee ballot may be rendered invalid for any of a range of

10

defects. *See* 1 Va. Admin. Code § 20-70-20(C). Voters, however, are entitled to cure such defects by noon on November 5. Va. Code § 24.2-709.1(C). To cure a defect, of course, a voter must know about it. Virginia requires registrars to notify voters of defects in their ballots only if the registrars receive the ballots by October 29. *Id.* USPS's delays mean that more ballots will be received by registrars after that date, such that voters may never learn that their ballots are defective. And while some voters whose ballots are returned later than October 29 may learn of defects with their ballots in other ways—including through outreach from DPVA or voluntary action from registrars—many voters whose ballots are not received until close to the November 5 cure deadline will not have enough time left to cure them. This issue will affect a substantial number of voters, because more than two percent of absentee ballots returned by Virginia voters so far in this election have been flagged by general registrars for curable defects. Whitley Decl. ¶ 12.

Each of these burdens will disproportionately fall on voters who rely on voting by mail because they are unable to vote in person on election day, including the severely immunocompromised, disabled, voters temporarily away from Virginia, and working people who cannot afford to take off. *See Obama for Am. v. Husted*, 697 F.3d 423, 433 (6th Cir. 2012) ("[E]arly voters tend to be members of demographic groups that may be unable to vote on Election Day or during the workday at local boards of elections because of work schedules."); *Price*, 540 F.3d at 109. "Disparate impact matters under *Anderson-Burdick*." *League of Women Voters of Fla., Inc., v. Detzner*, 314 F. Supp. 3d 1205, 1216 (N.D. Fla. 2018). Moreover, the disenfranchisement caused by USPS's delays will be unpredictable and arbitrary, resulting in some votes being counted and others not, based solely on how USPS handled the ballots. *See Jones v. U.S. Postal Serv.*, 488 F. Supp. 3d 103, 132 (S.D.N.Y. 2020) ("If [a voter's] ballot is not transmitted in time due to her local post office's delays, her 'right to full and effective participation in the political processes of h[er]

11

[Nation]'s legislative bodies' is impaired relative to that of both in-state and out-of-state voters with access to USPS branches functioning effectively." (some alterations in original) (quoting *Reynolds*, 377 U.S. at 565)).

There is no justification for USPS's failure to timely deliver election-related mail within Virginia, much less one compelling enough to justify these severe and severely uneven burdens. While USPS recently altered its service standards for First Class Mail, USPS is utterly failing to meet even these new, slower standards. And even assuming there are some marginal cost-saving benefits to the underlying policies and practices that are causing the delays, efforts to "increase efficiency" and "minimize administrative costs" cannot justify the potential disenfranchisement of numerous Virginia voters. *Vote Forward*, 490 F. Supp. 3d at 128; *Jones*, 488 F. Supp. 3d at 138 ("The Government asserts that the Postal Service's 'operational choices . . . reasonably relate to timely and efficiently delivering the nation's mail' and 'continuing its regular operations.' That explanation is not enough." (citations omitted)); *see also Watson v. City of Memphis*, 373 U.S. 526, 537 (1963) (stating the "vindication of conceded constitutional rights cannot be made dependent upon any theory that it is less expensive to deny than to afford them").

Multiple district courts have concluded as much in granting preliminary relief against USPS similar to what DPVA requests here, for injuries much like those DPVA and its members face. In *Vote Forward v. DeJoy*, for instance, the court preliminarily enjoined USPS and its officials from enforcing the 2020 policy changes which slowed down mail delivery, finding that the "inconsistency and delays in the delivery of mail" they caused likely imposed an unconstitutional burden on the fundamental right to vote. 490 F. Supp. 3d at 125, 128. "The USPS policy . . . directly impacts and controls the ability of millions of citizens to have their vote counted," the court reasoned. *Id.* at 123.

Applying the *Anderson-Burdick* balancing test, the court characterized the resulting burdens as "significant" because "the potential for voter disenfranchisement is immense." *Id.* at 125-26. Voters living in states, like Virginia, that have deadlines either on or shortly after election day for the receipt of ballots were "at particular risk," the court explained, because when their ballots would arrive, and whether they be counted, depended "upon 'arbitrary factors, such as the particular USPS branch that handle[d] their ballots.'" *Id.* at 125-126 (quoting *Jones*, 488 F.Supp.3d at 127). The delays imposed an "especially severe burden on those who have no other reasonable choice than to vote by mail." *Id.* at 126. USPS's purported interests "in maintaining efficient programs and in saving money" were wholly insufficient to justify these significant burdens on voters' constitutional rights, the court concluded. *Id.* at 128, 132; *see also Jones*, 488 F. Supp. 3d at 141, order clarified, 20 CIV. 6516, 2020 WL 6554904 (S.D.N.Y. Sept. 29, 2020) (finding delayed processing and delivery of election-related likely violated Equal Protection Clause and First Amendment and granting preliminary injunction requiring USPS officials to, among other things, prioritize and expedite delivery of election mail).

Just as in *Vote Forward*, USPS's failure to timely deliver election-related mail will make each of the deadlines associated with voting by mail more difficult—if not impossible—for many voters to meet. And just as in *Vote Forward*, "the potential for voter disenfranchisement is immense." 490 F. Supp. 3d at 126. Because of Defendants' actions, an unprecedented number of ballots may ultimately not be counted despite the voters having complied with all facets of Virginia law, particularly in Albemarle County and the City of Portsmouth. Through no fault of their own, these voters will be denied their fundamental right to vote for no legitimate reason much less one sufficient to justify this arbitrary and patently unfair result. DPVA is thus substantially likely to succeed on the merits.

### B. Without immediate relief, DPVA will suffer irreparable harm.

Defendants' failure to timely process election mail inflicts at least two forms of irreparable harm on DPVA. First, the delays in the processing of election mail put Virginia citizens, including many of DPVA's members, at risk of disenfranchisement. "Courts routinely deem restrictions on fundamental voting rights irreparable injury." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014); *see also, e.g.*, *Obama for Am.*, 697 F.3d at 436 (similar); *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986) ("The registration applicants in this case would certainly suffer irreparable harm if their right to vote were impinged upon."). Absent the requested relief, many Virginia voters and DPVA members—and particularly those in Albemarle County and the City of Portsmouth—may not receive their absentee ballots in time to vote them. Of those who do receive their ballots, many may complete them and deposit them in the mail by election day, as Virginia law allows, only to have them not reach local registrars in time to be counted, much less in time for any technical defects to be cured to save their ballots from rejection. The resulting disenfranchisement is a "real and completely irreparable" injury to those voters and DPVA members, because "once the election occurs, there can be no do-over and no redress" for voters whose votes were not counted through no fault of their own. *League of Women Voters of N.C.*, 769 F.3d at 247.

Second, the USPS delays irreparably impair DPVA's own mission and programs and hurt DPVA's electoral prospects. *See Vote Forward*, 490 F. Supp 3d. at 130 ("Obstacles that unquestionably make it more difficult for an organization to accomplish its primary mission provide injury for purposes both of standing and irreparable harm." (cleaned up) (quoting *Whitman-Walker Clinic, Inc. v. U.S. Dept. of Health and Human Services*, 485 F. Supp. 3d 1, 56 (D.D.C. 2020))). As part of its coordinated campaign for its slate of candidates in the 2021 elections, DPVA closely tracks the status of absentee ballot requests and contacts voters who have

requested absentee ballots but not yet voted in an effort to help such voters return their ballots so that every lawful vote is counted. The slow processing and delivery rate of election mail by the USPS has endangered this mission and forced DPVA to redirect scarce resources to addressing late-delivered and missing absentee ballots on a short timeline, rather than spending these resources on other aspects of the 2021 campaigns. And, because the delays particularly affect areas with significant populations of Democratic voters who DPVA has worked tirelessly to mobilize, *see* Whitley Decl. ¶ 9, delays that result in mailed ballots not being counted are highly likely to disadvantage DPVA electorally. *Cf. Nelson v. Warner*, 12 F.4th 376, 384 (4th Cir. 2021) (holding candidate who argued ballot design resulted in his electoral disadvantage had sufficiently alleged injury in fact). Both the redirection of DPVA's scarce resources and the electoral harm DPVA will suffer as a result of USPS's delivery delays are irreparable injuries in the context of an election that cannot be re-done once complete. *See Vote Forward*, 490 F. Supp. 3d at 130–31 (citing *League of Women Voters of N.C.*, 769 F.3d at 247).

### C. The public interest and the balance of equities favor the requested relief.

The public interest and the balancing of the equities also strongly favor injunctive relief. These two "factors merge when the Government is the opposing party," as it is here. *Nken v. Holder*, 556 U.S. 418, 435 (2009). "By definition, '[t]he public interest . . . favors permitting as many qualified voters to vote as possible.'" *League of Women Voters of N.C.*, 769 F.3d at 247 (quoting *Obama for Am.*, 697 F.3d at 437). "It is also clearly in the public interest to require that USPS implement policies that do not infringe upon constitutional rights." *Vote Forward*, 490 F. Supp. 3d at 131. Temporarily restraining and preliminarily enjoining Defendants to expedite election-related mail would serve those goals by allowing as many qualified Virginia voters as possible to have their votes counted.

## CONCLUSION

For the forgoing reasons, Plaintiff respectfully requests that the Court enjoin Defendants, together with their officers, agents, and employees, to expedite the delivery of election-related mail within Virginia, as further detailed in the accompanying proposed order.

Respectfully submitted, this 25th day of October, 2021.

*/s/ Jeffrey Breit*
Jeffrey Breit, VA Bar No. 18876
BREIT CANTOR
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, VA 23451
jeffrey@breitcantor.com

Marc E. Elias*
Elisabeth Frost*
David R. Fox, VA Bar No. 83894**
Henry Brewster*
ELIAS LAW GROUP LLP
10 G St., N.E., Suite 600
Washington, D.C. 20002
Telephone: (202) 968-4490
Facsimile: (202) 968-4498
melias@elais.law
efrost@elias.law
dfox@elias.law
hbrewster@elias.law

*Counsel for Plaintiff*

*\*Application to practice pro hac vice forthcoming*

*\*\*Application for admission to practice in E.D.V.A. pending*

16

**CERTIFICATE OF SERVICE**

In addition to filing this pleading via CM/ECF, I will arrange to have a copy of the foregoing motion and all exhibits (1) sent immediately via e-mail to Assistant United States Attorney Jonathan Lucier and to Joseph Borson at the Civil Division of the United States Department of Justice, (2) hand served on the U.S. Attorney for the Eastern District of Virginia, and (3) served on the U.S. Attorney General and both individual Defendants in the case by certified mail.


Dated: October 25, 2021             */s/ Jeffrey Breit*
                                    Jeffrey Breit
                                    *Counsel for Plaintiff*