# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| DEMOCRATIC PARTY OF VIRGINIA,<br><br>Plaintiff,<br><br>v.<br><br>FRANK VEAL, in his official capacity as the South Atlantic Division Manager for the United States Postal Service, GERALD ROANE, in his official capacity as Virginia District Manager of the United States Postal Service,<br><br>Defendants. | Civil Docket No. 21-cv-671 |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Defendants Frank Veal, in his official capacity as the South Atlantic Division Manager for the United States Postal Service, and Gerald Roane, in his official capacity as Virginia District Manager of the United States Postal Service, pursuant to the Court's October 25, 2021 Order (ECF No. 12) submit this Memorandum in Opposition to Plaintiffs' Emergency Motion for Temporary Restraining order and Preliminary Injunction (ECF No. 8).

## INTRODUCTION

The Postal Service is committed to serving its important role in the facilitation of the Nation's elections—and is committed to addressing and resolving any issues that do arise in the processing of time-sensitive ballots.  But Plaintiff's allegations lack factual and legal merit, so the Court should deny the emergency relief that Plaintiff seeks.

This lawsuit appears to be based on a misunderstanding.  Plaintiff filed this complaint on the basis of third-party data that Plaintiff says shows that 40% of ballots in Albemarle County and 25% of ballots in the City of Portsmouth remain "unscanned" by the United States Postal Service. Compl. ¶ 24.  But the Postal Service has in place systems to conduct rigorous, daily checks of its postal facilities to look for just this type of misplaced ballot.  It has conducted these checks as recently as today, and the Postal Service has not identified any such misplaced ballots.  Moreover, the Postal Service has been in regular contact with representatives from the Virginia Board of Elections and local election registrars to identify any problems.  The Postal Service talked with representatives from Albemarle and the City of Portsmouth as recently as yesterday, October 25, and neither of these representatives identified any issues with unscanned ballots.  In short, the Postal Service has processes in place to protect from—and if they occur, fix—precisely this problem, and as of now, all known mail-in ballots in its possession are being expeditiously processed and delivered.

The fundamental problem with this action is its factual premise. The status of Postal Service operations and the existence of delays are empirical questions. The factual declarations attached to this motion show that the Postal Service has in place methods to identify and to rectify delays in the processing of election mail and that there is no current issue requiring extraordinary relief.

Because of that factual shortcoming, Plaintiff's legal claims lack merit. Plaintiff invokes the *Anderson-Burdick* framework, which governs the constitutionality of election laws, e.g., laws affecting voter registration and eligibility, candidate selection, or the voting process itself. Assuming, *arguendo*, that similar standards would govern the operations of the Postal Service in an election context, Plaintiff has not shown that Virginia voters are or will be burdened by Postal Service operations. It is reasonable to hold the Postal Service to high standards in the context of its delivery of election mail, but Plaintiff has not met its burden to establish that the Postal Service is failing to meet that standard.

To be sure, Plaintiff contends that certain pieces of mail are difficult to track in the run-up to the election. That is, in part, because the Postal Service has taken steps to expedite the processing of election mail, skipping certain steps that might otherwise generate tracking data. But that is suggestive of a system that is working, not a system requiring judicial supervision. The Postal network is complex; requiring the Postal Service to modify its practices on the eve of an election, based on the current evidentiary record, would frustrate existing plans and coordination between Postal Service employees and state and local election officials, thereby imposing costs that outweigh the potential benefit.

Further, the balance of the equities counsels against Plaintiff's requested relief. Plaintiff requests an injunction requiring the Postal Service to *guarantee* that it will "deliver *all* election

related mail within Virginia no later than three days after its entry into USPS's system, and "process all outstanding election-related mail in Albemarle County and the City of Portsmouth within 24 hours of the entry of the Court's order."  Although the Postal Service takes its obligations seriously and has devised procedures to ensure that election mail is processed expeditiously, the Postal Service operates a complex network.  The Postal Service can guarantee that it will follow its specified *processes*, but the broader guarantee sought by Plaintiff fails to account for the variety of circumstances that cannot be anticipated in advance.

For all of these reasons, Plaintiff's motion should be denied.

## BACKGROUND

### A.  USPS's Virginia Election Plans and Procedures.

The United States Postal Service has extensive plans and procedures to facilitate the timely delivery of ballots in and beyond the Commonwealth of Virginia.   These plans begin by establishing and using regular lines of communication between the Postal Service and members of both the Virginia Department of Elections and Local Boards of Elections. *See* Ex. 1, Farmer Dec. ¶¶ 4, 5, 7.  These communications are important both to ensure that the Postal Service's plans for the transportation and delivery of ballots meet the needs and expectations and local and Commonwealth officials, and also ensures a clear channel to resolve any issues or problems as they occur.  *See generally* Farmer Dec. ¶¶ 4-7

Those efforts continue as Election Mail is processed for delivery from election officials to voters (for "outbound" ballots) and from voters to election officials (for "inbound" ballots).  As background, for absentee ballots, the mailing process begins when a voter requests a ballot from their local election official, which then enters the ballot into the Postal Service system. Ex. 2, McIlwain Dec. ¶ 6. When the Postal Service receives a ballot from an elections office, the ballot

is scanned into the Postal Service's Intelligent Mail Barcode tracking data and flagged as Election Mail.  It is then sorted and either sent to a delivery unit for delivery to the voter, or, if it has a farther distance to travel, transported to another plant for further processing. Mcllwain Dec. ¶ 6. When a voter completes a ballot, it is returned to the elections office by First-Class Mail, unless the voter chooses to pay for a premium service such as Priority Mail. Mcllwain Dec. ¶ 7.

Employees at the Postal Service's distribution centers and post offices are trained to identify Election Mail, which may use the Postal Service's official Election Mail logo, or come in containers or trays with a special "Green Tag 191" affixed to them to indicate that they contain ballots.  Mcllwain Dec. ¶ 5.

As part of the Postal Service's policies and directives for handling Election Mail, the Postal Service certifies on a daily basis that processing centers and post offices are "all clear" of Election Mail.  Mcllwain Dec. ¶ 9; Farmer Dec. ¶ 11.  This process requires each facility processing Election Mail to certify, on a daily basis, that it is clear of all Election Mail scheduled (or "committed") for delivery that day, and that any Election Mail committed for delivery the next day is at the front of the line.  Mcllwain Dec. ¶ 9; Farmer Dec. ¶ 11.  More specifically, in order to complete this certification, in-plant personnel use a checklist to search or "sweep" all locations in the Plant (e.g., manual operations, staging areas, docks, all delivery vehicles, all processing areas and trailers) to ensure that all pieces of Election Mail in the processing center or post office's possession are accounted for and being processed correctly.  This process allows the Postal Service to ensure that there are no ballots in any unexpected locations, as well as to identify any ballots in the mailstream that are not moving with sufficient speed. Mcllwain Dec. ¶ 9; Farmer Dec. ¶ 11.  To complete the "all clear" process, a Postal Service employee must certify that they have searched

all areas of the facility for Election Mail, and either none was identified, or any that was identified was dispatched.  McIlwain Dec. ¶ 10.

The Postal Service also has special policies in place to further expedite the delivery of ballots.  McIlwain Dec. ¶ 13.  More specifically, it will take ballots out of its normal processing (to "hold them out") for expedited delivery to registrars, via a process that involves an expedited approach to sorting ballots on the Postal Service's processing equipment.  While this process saves time, because ballots slotted for local hold out bypass certain aspects of the Postal Service processing system, they are not fully scanned in the same way as a typical mail-piece.  McIlwain Dec. ¶ 13.

### B.   Ballot Performance and Tracking in Virginia.

As explained above, the Postal Service has extensive processes for identifying and tracking ballots during the mailing process.  The Postal Service takes seriously the allegations that Plaintiff has raised, and has investigated extensively, to the extent time has allowed.  It has not found any evidence that the delays have approached the magnitude alleged by Plaintiff.  Rather, the available evidence indicates that the Election Mail process is proceeding normally, without unusual delays.

*First*, as discussed above, the Postal Service certifies that processing plants and post offices are "all clear" of Election Mail on a daily basis.  The Postal Service implemented the all-clear process on September 17, 2021 in mail processing plants, and on October 13, 2021 in the Postal Service's retail and delivery units in Virginia.  The all clear process will continue through November 16, 2021.  McIlwain Dec. ¶ 11; Farmer Dec. ¶ 11.  To date, the Richmond Plant has cleared Election Mail every day, including outbound ballots from Albemarle County and the City of Portsmouth.  McIlwain Dec. ¶ 11. As of October 25, 2021, the post offices in Albemarle County and the City of Portsmouth certified that those post offices have cleared Election Mail. Farmer

Dec. ¶ 12.   While Plaintiff has alleged that outbound ballots have been sitting unscanned in processing plants for "weeks," Compl. ¶ 1, the daily all-clear process would have captured any such unscanned election mail.   Farmer Dec. ¶ 12. At each of the Richmond Plant and the post offices in Albemarle County and the City of Portsmouth, as of October 25, 2021, "[n]o ballots were left on the plant floor, undelivered or stuck in the operations process.   Ballots have been and are being delivered in a timely manner.   There is no backlog of undelivered ballots."   Mcllwain Dec. ¶ 12.

*Second*, the Postal Service regularly works with Commonwealth and Local Election Officials as questions arise.   Farmer Dec. ¶ 6.   Any issues that were identified were promptly resolved, and none of those issues were significant (i.e., any issues involved 50 ballots or fewer).   Farmer Dec. ¶ 6; *see also id.* ¶ 10 (describing minor issue reported in Albemarle County at the start of October, involving a few ballots, which was immediately corrected without recurrence).   Furthermore, the Postal Service any online complaints that support Plaintiff's allegations regarding the number of unscanned ballots in Albemarle County and the City of Portsmouth, nor has it received any communications from the relevant Boards of Election regarding the same.   Farmer Dec. ¶ 7.   Indeed, the Postal Service spoke with the City of Portsmouth and Albemarle County Registrars on October 25, 2021, and neither raised concerns about scanning rates. Farmer Dec. ¶¶ 8-9.

The Postal Service is investigating the data produced by Plaintiff to attempt to identify this discrepancy.  It has discussed with the Virginia State Board of Elections the "mismatch" between the Postal Service's own understanding of its mailflow and the scanning data used by the State Department of Elections, which uses a third-party service provider called Ballot Scout/Democracy

Works.  Farmer Dec. ¶ 13.  It appears that this third-party data is not consistent with the Postal Service's data.  Farmer Dec. ¶¶ 14-16.

In short, both daily physical searches of USPS facilities and regular communications with those governmental officials best situated to identify any issues have not identified any serious problem, and certainly not on the level that Plaintiff alleges.

### C.  USPS's Overall Operations.

The Postal Service's Election Mail efforts are undoubtedly important.  At the same time, they represent one part of its operational responsibilities, and a relatively small portion of overall mail volume.  The Postal Service is one of the nation's largest and most complex business operations, employing more than 630,000 employees, operating more than 31,000 Post Offices, utilizing more than 204,000 delivery vehicles and 8,500 pieces of automated processing equipment, and typically processing and delivering more than 450 million mailpieces to nearly 160 million delivery points each day. *See* USPS FY2019 Annual Report to Congress at 2, 7.[1]

Significant business operations, of course, entail significant costs, and "[t]he Postal Service" therefore "needs effective and productive operations to fulfill its mission of providing prompt, reliable, and affordable mail service to the American public." *See* USPS OIG Audit Report No. 19XG013NO00O-R20, "U.S. Postal Service's Processing Network Optimization and Service Impacts" (June 16, 2020)) at 1.[2]  The Postal Service, with a few narrow exceptions, generally receives no tax dollars for operating expenses and relies on the sale of postage, products, and services to fund its operations. *See* Revenue Forgone, OIG Report, FT-AR-16-006 (2016), at 1.[3]

---

[1] https://about.usps.com/what/financials/annual-reports/fy2019.pdf.
[2] https://www.uspsoig.gov/sites/default/files/document-library-files/2020/19XG013NO000-R20.pdf.
[3] https://www.uspsoig.gov/sites/default/files/document-library-files/2016/FT-AR-16-006.pdf.

Although costs have always been a concern to the Postal Service, the financial position is now dire. *See* USPS Five-Year Strategic Plan FY2020-FY2024) at 11-12.[4] "Since 2007, [USPS has] suffered 13 years of consecutive net losses totaling $77.8 billion, with an $8.8 billion net loss in 2019 alone." *Id.* at 12.[5]

## LEGAL STANDARD

Preliminary injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Under *Winter*, "the movant 'must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest.'" *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 188 (4th Cir. 2013) (quoting *Winter*, 55 U.S. at 20). Each of these four factors must be satisfied to obtain preliminary injunctive relief. *Henderson v. Bluefield Hosp. Co.*, 902 F.3d 432, 439 (4th Cir. 2018). Consequently, if the party seeking the injunction fails to make a clear showing of any one of the four factors, the Court need not consider the remaining factors and must deny the preliminary injunction. *See id.* at 438–39.

---

[4] https://about.usps.com/strategic-planning/five-year-strategic-plan-2020-2024.pdf

[5] In its brief, Plaintiff attempts to relitigate certain operational changes that occurred in 2020, none of which is relevant to this case. *See* Pl.'s Mot. at 3-4. In any event, its allegations, which have been the subject of extensive litigation over the past year in other courts, are incorrect. Overtime has remained at similar levels, *see* Statement of Postmaster General and Chief Executive Officer Louis DeJoy before the House Comm. on Oversight and Reform (Aug. 24, 2020) *https://about.usps.com/newsroom/testimony-speeches/082420-pmg-statement.htm*, late trips have not been prohibited, *see, e.g.*, *Nat. Ass'n for Advancement of Colored People v. United States Postal Service*, 496 F. Supp. 2d 1, 17 (D.D.C. 2020), and the Postal Service did not send letters indicating that it intended to slow or delay delivery of Election Mail, or to otherwise alter its service standards for Election Mail, *see* Pl.'s Ex. C.

**ARGUMENT**

I.    **Plaintiff is not likely to succeed on the merits.**

    A.    **Plaintiff's claim lacks factual merit.**

At core, Plaintiff's request for emergency relief fails because the factual premise is based on a misunderstanding rather than a showing of current operational deficiencies.  As stated above, the Postal Service takes seriously its obligations to support the Nation's elections and stands ready to resolve any bona fide issues that may arise.  But in the absence of such issues, the Postal Service's current practices are appropriate.

Plaintiff's alleged harms are premised on the notion that there have been "significant delays in the processing of election-related mail."  *See* Mot. at 1, 14–15 (asserting that Plaintiff faces irreparable harm because mail delays could lead to voter disenfranchisement and impairment of Plaintiff's mission and programs).  But, as explained above, Plaintiff's Complaint is premised on assumptions about mail delays that are based on a misunderstanding.  *See* Background, *supra*.  In the absence of a factual demonstration that mail delays are likely to occur, Plaintiff cannot demonstrate a substantial likelihood that it will succeed in a challenge to the timely delivery of the mail.

    B.  **Plaintiff Plaintiff's claim lacks legal merit.**

In the absence of a factual premise, Plaintiff lacks a legal basis for the remedies it is asking the Court to impose.  Plaintiff asks the Court to apply the *Anderson-Burdick* framework, which courts have used to evaluate the constitutionality of state election laws.  This Court need not decide whether *Anderson-Burdick* applies in the different context presented here, because even if *Anderson-Burdick* does apply, the Postal Service is processing election mail in Virginia in a timely

and efficient manner, in coordination with the Virginia Board of Election.  There is thus no cause, on this record, to treat standard mail processing procedures as a constitutional violation.

The *Anderson-Burdick* test arises from a body of precedent concerning the constitutionality of state election laws.  Although the legal bases for an *Anderson-Burdick* claim are the First and Fourteenth Amendments, the test eschews the standard analyses applicable to claims under these provisions.  *See Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997).  Instead, the test generally requires the Court to "weigh the 'character and magnitude' of the burden [a] State's rule imposes on those rights against the interests the State contends justify that burden."  *Id.* (quoting *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)).

Multiple cases, including *Anderson* and *Burdick*, confirm that this test applies to election laws; *e.g.*, laws which "govern[] the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself."  *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983).  *Anderson* arose in the context of "Constitutional challenges to specific provisions of *a State's election laws*."  *Id.* at 789 (emphasis added).  Likewise, *Burdick v. Takushi* applied the test to circumstances in which "[a] court [is] considering a challenge to *a state election law*."  504 U.S. 428, 434 (1992) (emphasis added); *see also id.* (quoting *Anderson* balancing test, and noting that "[u]nder this standard," the Court "inquir[es] into the propriety of *a state election law*." (emphasis added)).  The Supreme Court has repeatedly indicated that this test applies to actual election laws. *See*, *e.g.*, *Timmons*, 520 U.S. at 358; *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451–52 (2008).

Assuming, *arguendo*, that *Anderson-Burdick* supplies the appropriate standard for evaluating Plaintiff's claim, Plaintiff has not demonstrated a likelihood of success on the merits. When applying the *Anderson-Burdick* balancing framework, the Court must "first consider the

character and magnitude of the asserted injury to the rights . . . that the plaintiff seeks to vindicate." *Anderson*, 460 U.S. at 789. The "rigorousness of [the Court's] inquiry into the propriety of a state election law"— assuming, *arguendo*, that USPS policy changes constitute "election law[s]"— "depends upon the extent to which the challenged regulation burdens First and Fourteenth Amendment rights." *Burdick*, 504 U.S. at 434. Defendant must establish a compelling government interest only if plaintiffs' "rights are subjected to 'severe' restrictions," *id.* (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)), such as those that effectively "disenfranchise [a] class" of persons, *Rosario v. Rockefeller*, 410 U.S. 752, 757 (1973). Otherwise, for minimal, "nondiscriminatory restrictions," the defendant need only establish an "important regulatory interest[]." *Burdick*, 504 U.S. at 434 (citation omitted).

_Burden._  As a threshold matter, as noted above, Plaintiff's central assertion—that USPS is not prioritizing the processing and delivery of election mail—is incorrect. USPS is coordinating with the relevant Board of Elections, and is working to ensure the efficient processing of election mail in Virginia. Furthermore, there is no evidence that any mail has been delayed. Because standard processes are being followed and no delays have been identified, there is no "severe burden" on Plaintiff at this juncture.

To be clear, the USPS need not guarantee that each and every piece of election mail in Virginia—regardless of when it is mailed—will be processed and delivered by Virginia's designated deadlines. Normal mail delivery times are a part of the process, and voters are advised to account for ordinary postal operations when voting by mail. *See New Ga. Project*, 976 F.3d 1282 ("Voters must simply take reasonable steps and exert some effort to ensure that their ballots are submitted on time, whether through absentee or in-person voting.").

Indeed, multiple Circuit courts have recently rejected theories suggesting that voters have a right to request and mail a ballot at any particular time, and have expressly affirmed voting deadlines that require an earlier vote. *See*, *e.g.*, *Common Cause v. Lawson*, 977 F.3d 633, 664-65 (7th Cir. 2020) (rejecting the theory "that the Constitution entitles all persons who cast absentee ballots to be free of any risk that the ballot will not count, even if they mail their ballots close to Election Day," and noting that "[p]eople who worry that mail will be delayed during the pandemic can protect themselves by using early in-person voting or posting their ballots early"); *Mays v. LaRose*, 951 F.3d 775, 792 (6th Cir. 2020) (rejecting theory that Ohio must allow for mail-in voting registration fewer than three days before the election since "there is no constitutional right to an absentee ballot," "Ohio's deadline . . . is nondiscriminatory," and although "this law may eliminate opportunities to vote for electors who fail to register before the deadline," it "imposes only a minimal burden on the right to vote"); *Org. for Black Struggle v. Ashcroft*, 978 F.3d 603, 608 (8th Cir. 2020) (rejecting challenge to Missouri law that required mail-in ballots to be sent via USPS, concluding that it "impose[d] a de minimis burden on voters if they are concerned that their ballots will not be received by the election board on time" since "they simply may make arrangements to put completed ballots in the mail earlier"); *New Ga. Project*, 976 F.3d at 1281–82 (rejecting challenge to Georgia's ballot-receipt deadline because, regardless of "delays in the postal service," voters "receive the ballots as early as 49 days before the election" and "can return their ballots through the mail, hand-delivery, or a drop box," and so the law required "[v]oters" to "simply take reasonable steps and exert some effort to ensure that their ballots are submitted on time").

*Regulatory Interests.* "[W]hen a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteen Amendment rights of voters," in contrast to a severe restriction, "'the State's important regulatory interests are generally sufficient

to justify' the restrictions." *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 788); *see also Libertarian Party*, 682 F.3d at 74 (drawing contrast between laws that subject voters rights to "severe restrictions" and those impose only "reasonable, nondiscriminatory and need only be justified by the government's "important regulatory interests").  USPS's determination may therefore survive an *Anderson-Burdick* inquiry if justified by "general regulatory interests," which includes a desire to minimize "administrative costs." *Libertarian Party*, 682 F.3d at 77.  This is true even if the plaintiff might "benefit" from a different USPS policy towards election mail.  *See id.* at 75 (noting that a minor party "would benefit from knowing how many people voted for its candidate," but the District's refusal to provide such vote was merely "inconvenient" and thus subject to the "important regulatory interest" standard). Here, the Postal Service had sound economic rationales for its operational standards. Indeed, in its motion, Plaintiff makes no argument for why the Postal Service would not satisfy the lesser "important regulatory interest" standard.

Plaintiffs' legal theory could potentially require the Postal Service to guarantee that all election mail must be processed and delivered within some abbreviated timeline.  But there are hundreds, if not thousands, of state and local elections throughout the year.[6]  Requiring that the Postal Service adopt this standard for each and every election would require the Postal Service to dedicate extraordinary resources year-round for whatever elections may be held each month of each year.  Such a decision would, in effect, create an entirely separate category of mail, without coordination with the Postal Regulatory Commission, the Postal Service's regulator, or the

---

[6] *See, e.g.*, Elections Calendar, https://ballotpedia.org/Elections_calendar#Upcoming_election_dates (last accessed Apr. 8, 2021).

Congress, to the detriment of the other important responsibilities of the Postal Service that would be impacted by this extraordinary shift in resource allocation.

Nor is it clear what the "trigger" for such a requirement would be.  Plaintiffs point to statistics concerning certain ballots that thus far have not been delivered to registered voters.  *See* PI Mot.  at 3-4.  But the Postal Service does not (and cannot) guarantee that every piece of mail is delivered on time; such a promise would be an impossibility given the size of the Postal Service's network.  *See Nat'l Urban League v. DeJoy*, Civ. A. No. GLR-20-2391, 2020 WL 6363959, at *9 (D. Md. Oct. 29, 2020) ("The Court could no sooner order Defendants to restore on-time performance to 93.88% . . . than it could order a baseball player to achieve a .300 batting average over his next several games.  USPS's on-time performance score is an holistic measure that reflects the result of a combination of a host of factors, some internal to and controllable by USPS, and some external and outside of USPS's control.  The Court cannot require a party to meet a measure it can only partially control.").

Rather, service performance targets (such as 96 percent of First-Class Mail being delivered on time) are just that—a target or goal—not a legal requirement.  *See, e.g.*, OIG Audit Report (Mar. 5, 2021), at 3 (noting that "the Postal Service has not met its First-Class Mail service goal in five years").[7]  Accordingly, USPS's economic rationales for its current logistical policies and practices justify any burden posed by incidental delays in the delivery of mail ballots.  Plaintiffs are therefore unlikely to prevail on their *Anderson-Burdick* claim.[8]

---

[7] https://www.uspsoig.gov/sites/default/files/document-library-files/2021/20-318-R21.pdf.
[8] This brief addresses the appropriate analysis of the facts of this case under the *Anderson-Burdick* test.  The Department of Justice reserves comment on whether any other law, practice, or procedure, in this jurisdiction or elsewhere, meets the *Anderson-Burdick* test or complies with federal statutes designed to protect the right to vote, such as the Voting Rights Act.

II.     **Plaintiff cannot satisfy the other preliminary injunction factors.**

     A.     **Plaintiffs cannot demonstrate irreparable harm.**

Plaintiff cannot obtain an injunction without establishing that it is "likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20.  Plaintiff "must make a clear showing of irreparable harm . . . and the required irreparable harm must be neither remote nor speculative, but actual and imminent." *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 283 (4th Cir. 2002).

As an initial matter, Plaintiff's delay in bringing this suit undercuts its claim of irreparable injury.  The Fourth Circuit has held that an unexcused delay in seeking extraordinary injunctive relief may "indicate an absence of the kind of irreparable harm required to support a preliminary injunction." *Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*, 872 F.2d 75, 80 (4th Cir. 1989).  Here, Plaintiff's complaint references the Postal Service's 10-year plan, which was announced in April 2021, *see* Compl. ¶ 16, and alleged mail delays that occurred in fiscal quarter ending in June 30, 2021, *see id.* ¶ 19, but Plaintiff waited until October 22, 2021—eleven days before the upcoming election—to file its complaint.  Moreover, after filing its complaint, Plaintiff then waited three more days to file its motion for a temporary restraining order and preliminary injunction.  By contrast, the plaintiffs who brought suit against the Postal Service in the lead-up to the 2020 Election sought injunctive relief months before the election. *See, e.g.*, *Washington v. Trump*, No. 20-cv-3127 (E.D. Wash.) (complaint filed August 18, 2020).  Plaintiff does not explain why—if it truly believed that mail delays were causing it irreparable harm—it did not bring suit sooner. *See Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) ("a party requesting a preliminary injunction must generally show reasonable diligence.")

This delay in bringing suit is not simply a technical issue.  It is inherently related to this Court's ability to issue a workable temporary remedy that would be tailored to address the

purported irreparable harms.  With only eleven days until the election, the ability of USPS to implement any injunction, let alone the sweeping one that Plaintiff requests, is sharply limited. And the burden on USPS of attempting to disrupt its current election mail efforts in Virginia, which have been planned in coordination with state officials for months, would be extraordinary. Plaintiff has no explanation for this delay—unlike other litigants, Plaintiff did not attempt to contact the Postal Service or undersigned counsel in advance of filing this motion to determine whether the Postal Service had similarly identified a problem with election mail, or whether the data that Plaintiff independently received was in fact accurate.  Due to that delay, the Postal Service was deprived of a meaningful opportunity to meet and confer with Plaintiff to attempt to resolve Plaintiff's concerns before filing suit.

Setting aside Plaintiff's unexplained delay in bringing its claims, Plaintiff also cannot demonstrate an irreparable injury because it has not demonstrated a cognizable injury, as all of Plaintiffs' alleged harms assume "significant mail delays" that are not in fact borne out by the evidence.  *See* Section I.A, *supra*.

**B.     The balance of the equities counsels against Plaintiff's requested injunction.**

Roughly a week before Virginia's gubernatorial election—and roughly ten days before the mail-in ballot receipt deadline—Plaintiff asks this Court to impose a compressed time-limit by which the Postal Service must process and deliver an entire category of mail, and yet Plaintiff fails to explain how the Postal Service can guarantee that it will meet this time limit for every piece of mail. Nor could it. The Postal Service's logistical network is complex, involving a number of different steps and facilities, all of which impact when any single piece of mail will be delivered. *See* OIG Audit Report (Apr. 12, 2019) ("The Richmond District has 74 delivery units, 1,415 city

routes in the Delivery Operations Information System, and 1,064,670 city delivery points").[9] For example, mail received at a local facility is typically shuttled—usually by truck—to an initial processing facility that handles all categories of mail, where it is then pushed through the logistical chain until it reaches the local mail facility responsible for delivery to the destination. A delay during *any* step in this process—which can be caused by any number of factors, including employee unavailability, human error, or technological issues—can prevent a piece of mail from being delivered by a certain date.[10]

Thus, it is practically impossible for the Postal Service to ensure that, through its long-established logistical networks, "all election related mail within Virginia" will be delivered "no later than three days after its entry into USPS's system, and "all outstanding election-related mail in Albemarle County and the City of Portsmouth" will be processed "within 24 hours of the entry of the Court's order." PI Mot. at 2. Indeed, to comply with this type of injunction, and avoid a risk of contempt, the Postal Service would potentially have to consider adopting ad hoc mail delivery practices that stray from its current logistical processes for election mail and introduce new risks in the system. This would impose a significant burden on the Postal Service, especially since it would have to adopt these changes on a highly compressed timeline in light of the date of the Virginia gubernatorial race.  These burdens are not justified given Plaintiff's delay in bringing suit, and requesting this relief.

---

[9] https://www.uspsoig.gov/sites/default/files/document-library-files/2019/DR-AR-19-005.pdf.
[10] To be sure, the Postal Service never guarantees that each and every piece of mail will be delivered within the target service standard. *See* OIG Audit Report, https://www.uspsoig.gov/sites/default/files/document-library-files/2019/NO-AR-19-008.pdf ("Service standards specify timeliness targets for delivering mail after receiving it from a customer" and "the Postal Service" obviously "has not met" all of "its service performance targets.").

Further, and more fundamentally, Plaintiff's requested injunction cannot meet the requirements of Rule 65(d)(1), which requires that "[e]very order granting an injunction and every restraining order must . . . state its terms specifically" and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Here, of course, the requested injunction only identifies a result, or an objective, but does not state the precise operational changes that USPS must adopt to achieve that result. The Court therefore should not, and cannot, issue Plaintiff's requested injunction.

## CONCLUSION

The Court should deny Plaintiff's Motion for a Temporary Restraining Order and a Preliminary Injunction.

Dated:  October 26, 2021       Respectfully submitted,

BRIAN D. NETTER
Deputy Assistant Attorney General

ERIC R. WOMACK
Assistant Director, Federal Programs Branch

JESSICA D. ABER
UNITED STATES ATTORNEY

/s/ Jonathan Lucier
Jonathan T. Lucier (VSB No. 81303)
Office of the United States Attorney
919 East Main Street, Suite 1900
Richmond, Virginia 23219
Tel.: (804) 819-5400
Fax: (804) 771-2316
Email: jonathan.lucier@usdoj.gov

JOSEPH E. BORSON (Va. Bar No. 85519)
KUNTAL CHOLERA
JOHN J. ROBINSON
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington D.C. 20005
(202) 514-1944
Joseph.Borson@usdoj.gov

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I certify that on October 26, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record.

/s/_____
Jonathan T. Lucier
VSB No. 81303
Attorney for the Defendants
Office of the United States Attorney
919 East Main Street, Suite 1900
Richmond, Virginia 23219
Telephone: (804) 819-5400
Facsimile: (804) 771-2316
Email: jonathan.lucier@usdoj.gov